**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **AARON GAMBLE,** | * | |
| *Plaintiff,* | * | |
| **v.** | * | **Case No.: 20-cv-3126-PWG** |
| **CHARLES COUNTY, MARYLAND** *et al.,* | * | |
| | * | |
| *Defendants.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Defendants Charles County and Sheriff Troy D. Berry accepted Plaintiff Aaron Gamble as a Police Recruit, and he was in training for this position from approximately June 8, 2019 until July 2, 2019, although his employment as a recruit preceded his time at the training academy by several months. Second Amended Complaint ("Compl.") ¶¶ 21, 28, 33 (ECF No. 25). Prior to taking this job with Defendants, Mr. Gamble had worked as a law enforcement officer for over a decade. *Id*. ¶ 13. On July 2, 2019, Defendants terminated Mr. Gamble's employment as a recruit after he was accused of cheating on a CPR test at the academy; he proceeded to file a notice of discrimination against the Charles County Sheriff's Office with the Equal Employment Opportunity Commission ("EEOC"),[1] and then filed this suit on October 27, 2020. *Id*. ¶¶ 40, 46. Mr. Gamble alleges in Count I that Defendants discriminated against him on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, as amended; in Count II that Defendants

---

[1] Mr. Gamble's EEOC filing resulted in the EEOC concluding it was unable to find the information alleged stated a violation of the law, but that such a finding did not certify the County's compliance with the relevant statutes. Compl. ¶ 50.

retaliated against him in violation of Title VII; and, in Count III, that Defendant Charles County failed to pay overtime to Mr. Gamble and others similarly situated, in violation of the Fair Labor Standards Act.  As to Counts I and II only, Defendants Berry and Charles County each have moved to dismiss or, in the alternative, for summary judgment.  ECF Nos. 31, 32.  The parties have fully briefed the motions (ECF Nos. 31, 32, 33, 34, 37, 38) and a hearing is not necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons that follow, the motions are DENIED.

## Factual Background

When Mr. Gamble started his job with Charles County as a Police Recruit,[2] he had already worked in law enforcement for more than ten years, and previously became a certified CPR instructor.  Compl. ¶¶ 13, 40.  While employed as a recruit, he received paychecks from the Charles County Board of Commissioners, Compl. ¶ 17; his W-2 form from Charles County (when Mr. Gamble requested his W-2 from the Sheriff's Office, the office instructed him to contact the County directly), *id*. ¶ 18; and his benefits from the County, *id*. ¶ 19.

On June 8, 2019, Mr. Gamble started at the Academy, which the complaint alleges was supervised at all relevant times by members of the Charles County Sheriff's Office.  *Id.* ¶¶ 21, 22.  There, he encountered Master Corporal Joseph Piazza, the recruits' immediate supervisor who was at all times relevant to this suit employed by the Defendants.  *Id.* ¶ 24.

Just over a month before starting at the Academy, Mr. Gamble and two other African-American male recruits were approved to receive shaving waivers due to a medical condition (that predominantly afflicts African-American men) caused by shaving.[3]  *Id.* ¶ 27.  But on the first day of training, Cpl. Piazza announced to the class that their waivers would not be honored and that

---

[2]    The complaint states that the position Mr. Gamble applied for was titled, interchangeably, Police Officer, Patrol Officer, and Deputy Sheriff.  Compl. ¶ 15.
[3]    Most likely pseudofolliculitis barbae, although the filings do not say so specifically.

the recruits should not bother returning to the Academy the following Monday unless they had shaved.  *Id*. ¶ 28.  In response,  Mr. Gamble shaved.  *Id*. ¶ 29.  One of the other African-American recruits declined to shave; Cpl. Piazza responded by requiring him to do extra exercises: pushups, jumping jacks, and low crawls in a sand pit.  *Id*. ¶ 30.  After the recruit filed a complaint, Cpl. Piazza warned the class that speaking out about the Training Academy would have consequences.  *Id*. ¶¶ 30, 31.  Cpl. Piazza reiterated this warning when he allowed Mr. Gamble and another recruit to grow out their beards, so long as they did not complain like their colleague.  *Id*. ¶ 32.

The complaint further alleges that Cpl. Piazza used racial epithets in front of the recruiting class, including one directed at a Latina recruit and, immediately after, suggested he would soon use a highly offensive pejorative slur targeting African-American recruits.  *Id*. ¶ 34.  Cpl. Piazza is also alleged to have insulted the Koran and the Bible.  *Id*. ¶ 35.

Mr. Gamble first raised concerns about Cpl. Piazza's conduct on June 24th, asking to speak privately to Master Sergeant Keith Moody; Mr. Gamble received a call from Lt. Charles Bean in the Internal Affairs Department that night, during which he complained about Cpl. Piazza's offensive conduct and provided names of witnesses.  *Id*. ¶¶ 38, 39.

On July 2, 2019, the day Defendants terminated Mr. Gamble's employment, the recruit class took a written CPR test.  *Id*. ¶ 40.  Cpl. Piazza assigned the recruits their seats and placed Mr. Gamble close to Cpl. Piazza.  *Id*. ¶ 41.  After the test started, Cpl. Piazza yelled at Mr. Gamble, demanding to know what was on Mr. Gamble's desk and accused him of having a face-down piece of paper that contained the answers to the test.  *Id*. ¶¶ 42, 43.  The complaint alleges that the paper was in fact a "Practical for Chest Compressions," but did not contain test answers.  *Id*. ¶ 43.

Two hours after completing the test, Sergeant Cusmano, who the complaint alleges was Cpl. Piazza's immediate supervisor, directed Mr. Gamble to re-take the test, which Mr. Gamble

passed (unsurprisingly, since he already was a certified CPR instructor).  Compl. ¶ 40, 44.  But at the end of the day, Sgt. Cusmano told Mr. Gamble to pack his things and report to the Training Academy Director.  *Id*. ¶ 45.  There, Director Philip Davis informed Mr. Gamble he was being dismissed from the Academy for having cheated on the first CPR test.  *Id*.  After his dismissal, Mr. Gamble timely filed a complaint against the Charles County Sheriff's Office with the Equal Employment Opportunity Commission ("EEOC") (without assistance of counsel) in which he alleged race-based discrimination and retaliation.  *Id*. ¶ 49.  Mr. Gamble states he believed he did not also need to name Charles County in the EEOC charge because he understood the Sheriff's Office to be a county agency.  *Id*.  On August 20, 2020, the EEOC informed Mr. Gamble that it was unable to find a violation of any applicable employment discrimination statute, but noted that its finding did not certify the Sherriff Office's compliance with the applicable statutes.  *Id*. ¶ 50.  Thereafter, Mr. Gamble filed suit in this Court.

**Standard of Review**

*I. Rule 12(d) Conversion*

When reviewing a motion to dismiss, "[t]he court may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed."  *Sposato v. First Mariner Bank*, No. CCB–12–1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013); *see also CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009).  However, if the Court considers matters outside the pleadings, the Court must treat the motion as a one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d); *Syncrude Canada Ltd. v. Highland Consulting Grp., Inc.*, 916 F. Supp. 2d 620, 622–23 (D. Md. 2013).

Under Fourth Circuit law, proper conversion under Rule 12(d) requires two conditions: (1) that all parties "be given some indication by the court that it is treating the 12(b)(6) motion as a

motion for summary judgment;" and (2) that all parties "be afforded a reasonable opportunity for discovery." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). Notably, "the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion." *Ridgell v. Astrue*, DKC–10–3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012). Thus, this requirement "can be satisfied when a party is 'aware that material outside the pleadings is before the court.'" *Walker v. Univ. of Md. Med. Sys. Corp.*, No. CCB-12-3151, 2013 WL 2370442, at *3 (D. Md. May 30, 2013) (quoting *Gay*, 761 F.2d at 177). Indeed, while the Court "clearly has an obligation to notify parties regarding any court-instituted changes in the pending proceedings, [it] does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Here, the title of the motions themselves, "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment," makes it obvious that the Court might construe the Defendants' motions as seeking summary judgment, rather than dismissal, and thereby provides sufficient notice to the Plaintiff. *See Ridgell*, 2012 WL 707008, at *7; *Laughlin*, 149 F.2d at 260–61.

Generally, however, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2011); *see Putney v. Likin*, 656 F. App'x 632, 639–40 (4th Cir. 2016) (per curiam); *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). Certainly, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To that end, Federal Rule of Civil Procedure 56(d) unambiguously provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

Here, Mr. Gamble has not filed an affidavit identifying any discovery that he needs in order to fully respond to a summary judgment motion. Instead, the parties have attached dueling declarations to their briefs and Defendant Charles County included as an exhibit the EEOC complaint Mr. Gamble filed. The claims here and the factual basis upon which they rely are relatively straightforward, and Mr. Gamble does not seek discovery in order to adequately oppose the motions.

Nor does Mr. Gamble dispute the authenticity of the exhibits provided by the Defendants, and he has provided an exhibit himself, that being his own declaration regarding the facts in this case. Gamble Decl., Ex. 1 to Pl.'s Opp. (ECF No. 33-1). Therefore, I find that the most appropriate approach is to address Defendant Berry's motion, which the County adopted, Def. Charles Cnty.'s Mot. 4 (ECF No. 32-1), as one for summary judgment, and I will consider the exhibits in addition to the allegations in the complaint.

The County has also raised as grounds for dismissal Mr. Gamble's failure to comply with Title VII's naming requirement because he failed to list the County in the EEOC complaint. I will address this argument separately.

*II. Summary Judgment Standard*

Federal Rule of Civil Procedure 56(a) provides for judgment in favor of the movant "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In reviewing the evidence related to a motion for summary judgment, the Court considers undisputed facts, as well as the disputed facts viewed in the light

most favorable to the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).  Only factual disputes that "might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Additionally, the factual dispute must be genuine to defeat a motion for summary judgment, in that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version.").  It is the nonmoving party's burden to confront a motion for summary judgment with affirmative evidence to show that a genuine dispute of material fact exists. *Anderson*, 477 U.S. at 256.  A plaintiff nonmovant, "to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor." *Id.*

## Discussion

*Racial Discrimination*

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff may establish discriminatory intent either by direct or circumstantial evidence, or a plaintiff may "proceed under a 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination or retaliation, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill v. Lockheed Martin Logistics, Mgt., Inc.*, 354 F.3d 277, 287 (4th Cir. 2004) (en banc), *abrogated on other grounds by Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167 (2009).  It is up to the plaintiff to decide which path to take. *See Foster v. Univ. of Md.-*

*E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).  Mr. Gamble's response in opposition to Defendants' motions for summary judgment suggests he relies on the familiar *McDonnell Douglas* framework. *See* Pl.'s Opp. 6, 20 (ECF No. 33).

To state a claim for discrimination under Title VII, a Plaintiff must allege (in his complaint) and demonstrate (in response to a summary judgment motion) that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) similarly situated people outside of the protected class were treated more favorably. Def. Berry's Mot. 11 (citing *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

In the present case, Sheriff Berry (himself an African American) argues that Mr. Gamble's discrimination claim must fail because he cannot present evidence to support a prima facie case. *Id*. 12.   The County has adopted this argument.  Def. Charles Cnty.'s Mot. 4.   Because I am treating the Defendants' motions as motions for summary judgment, I will focus their arguments concerning summary judgment, not those arguing that the second amended complaint fails to adequately plead causes of action.  However, prior to turning to the summary judgment arguments, it is first necessary to address Sheriff Berry's argument that Cpl. Piazza's discriminatory conduct cannot be imputed to the Sheriff.  Def. Berry's Mot. 15 (citing *Breck v. Md. State Police*, Civ. No. TDC-16-2075, 2017 WL 2438767, at *6 (D. Md. June 5, 2017)).  This is so, the Sheriff argues, because it was the Sheriff, not Cpl. Piazza, who fired Mr. Gamble, and the complaint does not allege that Cpl. Piazza exercised controlling influence over the Sheriff causing him to fire the Plaintiff, or that Cpl. Piazza was the decisionmaker who fired him.  *Id*.

As to whether Cpl. Piazza's alleged racial animus may be imputed to Sheriff Berry, Mr. Gamble points to the "cat's paw theory of liability," which allows a discrimination claim to survive

where a supervisor (Cpl. Piazza), though lacking formal decisionmaking authority, acts with racially motivated discriminatory intent to influence the ultimate decisionmaker (Sheriff Berry), inducing him to initiate the challenged adverse employment action. *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011).[4]  Mr. Gamble argues that before he started training at the Police Academy, he was warned by other officers to watch out for himself because there were instructors at the academy who had reputations for discriminating against African-American recruits, Pl.'s Opp. 9 (ECF No. 33) (citing Comp. ¶ 33).  Further, he alleges that the Sheriff "simply rubber-stamped Piazza's cheating accusations, terminating Gamble immediately." *Id*.  And he asserts that the information upon which the Sheriff relied in making the decision to terminate Mr. Gamble's employment put the Sheriff on notice that Cpl. Piazza was retaliating against him by levying the cheating allegation, just eight days after Mr. Gamble accused Cpl. Piazza of discrimination against African American recruits. *Id*. at 10 (citing Ex. 2 to Def. Berry's  Mot.,  6–7 (Memo to Sheriff Berry Recommending Termination) (ECF No. 31-2)).

     I find that Mr. Gamble has pleaded a sufficient factual basis under which to impute liability to the Sheriff.  The cat's paw theory has limited applicability, but Judge Chuang's recent decision in *Lim v. Azar*, also a Title VII suit, offers helpful guidance.  This theory of liability is permitted

---

[4]     Justice Scalia explained the "cat's paw" term's origin and incorporation into employment law as follows:

> The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990. See *Shager v. Upjohn Co*., 913 F.2d 398, 405 (CA7). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

*Staub*, 562 U.S. at 415 n.1.

where a supervisor's racially discriminatory animus, here, Cpl. Piazza's, influences the ultimate decisionmaker's action (Sheriff Berry's) to take the challenged adverse employment action. *Lim v. Azar*, 310 F. Supp. 3d 588, 602 (D. Md. 2018). Further, "a supervisor's discriminatory animus may support liability only if the supervisor was, in effect, 'principally responsible for, or the actual decisionmaker behind, the action,' such as when the formal decisionmaker simply rubberstamped the supervisor's recommendation." *Id.* (citing *Hill v. Lockheed Martin*, 354 F.3d 277, 291 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).

Mr. Gamble was terminated for cheating on the same day in which Cpl. Piazza accused him of cheating on the CPR exam. Thus, there was minimal (if any) investigation into whether Mr. Gamble was cheating before the decision to terminate him took effect, and it is undisputed that the source of the cheating allegation was Cpl. Piazza, against whom Mr. Gamble had recently filed a racial discrimination complaint with internal affairs, Compl. ¶ 38–39. This sequence of events permits the reasonable inference in Mr. Gamble's favor that Sheriff Berry was aware of these occurrences and simply rubber stamped Plaintiff's dismissal at the instance of Cpl. Piazza. A jury may see things differently, of course, but at this procedural stage there is enough to allow the claims against Sheriff Berry to proceed under a cat's paw theory.

a) Adequate Performance

I will now turn to the parties' arguments on whether summary judgment should be granted to Defendants on the Title VII claim. In Sheriff Berry's view, Mr. Gamble cannot meet the first element of a discrimination claim, namely that he "'always met or exceeded the performance expectations' or received 'positive feedback or performance reviews.'"  Def. Berry's Mot. 13

(citing *Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015), *partially abrogated on other grounds by Bing v. Brivo Sys., LLC*, 959 F.3d 605, 614–15 (4th Cir. 2020)).

In response, Mr. Gamble argues the bar is low when it comes to alleging satisfactory performance and that he need not present "a staggering litany of facts" to support his claim.  Pl.'s Resp. 13 (ECF No. 33) (citing *Georges v. Dominion Payroll Servs., LLC*, Civ. A. No. 3:16-cv-777, 2017 WL 3669029, \*5 (E.D. Va. Aug. 24, 2017)).[5]  The undisputed facts reflect that Mr. Gamble already was a certified CPR instructor before he entered the academy, passed his CPR exam twice in the same day, and denied cheating either time.  *Id.*  Further, Defendants do not dispute Plaintiff's decade of prior law enforcement experience, which Plaintiff alleges allowed him to do "ride-alongs" with other Sheriff's deputies before he even entered the academy, all of which bolsters Mr. Gamble's claim that he did meet or exceed performance expectations.  This is sufficient to plead that he did, as well as create a genuine issue of material fact as to whether he did, precluding dismissal or entry of summary judgment.  *Id.*

I note that the Defendants attempt to argue that Mr. Gamble was teetering on the brink of dismissal from the academy independently of the cheating allegations (due to repeated failed quizzes[6] and apparent emotional instability).  But a jury reasonably could find that this is mere *post hoc* self-serving rationalization, because the reason given for Mr. Gamble's termination had nothing whatsoever to do with anything other than the alleged cheating on the CPR exam,  and the record before me is devoid of evidence that there were legitimate non-discriminatory reasons for terminating Plaintiff separate and apart from the alleged cheating that the Sheriff took into

---

[5]     The *Georges* case is not particularly persuasive at this juncture, considering it was a ruling on a motion to dismiss, not one for summary judgment.

[6]     Quizzes are worth 1/4 of a test.  Ex. 1 to Berry Dec. 1 (Separation Memo) (ECF No. 31-2 at 6).

consideration before terminating him on the day of the CPR exam, such as a "performance improvement plan," disciplinary record, or probationary status.   Rather, Defendants cite to Plaintiff's supposedly poor academic performance, the specifics of which, Mr. Gamble argues, were never made known to him.   Gamble Decl. ¶ 9 ("I was never provided any information about my academic performance or my grades, nor was I ever told that my place in the Training Academy was in jeopardy due to my academic performance.").   Further, Mr. Gamble contends, it was common for recruits to fail quizzes, apparently without that being a basis for termination from the Academy.   *Id.* ¶ 5.   Defendants counter that he was below the academic performance threshold required to graduate from the academy, with a grade point average ("GPA") of 70%, 5% below the state-mandated requirement of 75%.   Ex. 2 to Berry Decl. 4 (Lt. Bean Internal Investigation Memo) (ECF 31-2 at 13).   Certainly, academic performance at or above the GPA threshold would make for a stronger case that he was performing adequately, but Mr. Gamble had time yet to improve his GPA before completing the academy, and Defendants have not shown that dropping below the GPA threshold at some point in time prior to completing the academy was grounds for dismissal or that this alone would support a finding of inadequate performance.   While this is a close issue, there is before me sufficient information to create a genuine dispute of material fact as to whether the Plaintiff's performance at the time he was terminated from the academy was sufficiently satisfactory.

b)  Race-based unfavorable treatment

Sheriff Berry also argues that Mr. Gamble cannot offer evidence showing unfavorable treatment based on race, and that this deficiency merits summary judgment for Defendants.   Def. Berry's Mot. 14.   Defendants argue that a plaintiff typically proves race-based unfavorable treatment by identifying a comparator outside the protected class who was treated more favorably.

*Id.* at 14 (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)); *see also*

*Battle v. Burwell*, No. PWG-14-2250, 2016 WL 4993294, at *12 (D. Md. Sept. 19, 2016)

(requiring plaintiff alleging race-based discrimination to demonstrate he received less favorable

treatment than similarly situated employees outside the protected class). Here, Sheriff Berry

argues, Mr. Gamble cannot make this showing because Cpl. Piazza also made disparaging remarks

towards "Hispanics, Muslims, and Christians (presumably white)," (apparently believing that if

Cpl. Piazza was known to make discriminatory comments about recruits representing many

protected classes, it somehow vitiates a finding that his "come one, come all" bigotry precludes a

finding of discrimination against a member of one particular protected class). Def. Berry's Mot.

15. Further, Defendants argue, a white female recruit was also discharged from the Academy after

being accused of academic dishonesty. *Id.* (citing Compl. ¶ 39). And, to top it off, Sheriff Berry

speculates that Cpl. Piazza's conduct may well have been intended for training purposes.[7]

In response, Mr. Gamble argues that the facts viewed in the light most favorable to him

demonstrate the Defendants targeted him based on race and treated him differently than his

Caucasian peers. Pl.'s Opp. 15–16 (ECF No. 33). Examples include Cpl. Piazza using a racial

slur in front of him, declining to initially honor a shaving waiver due to Mr. Gamble's skin

condition that affects predominantly African-American men, and declining to question the

Caucasian recruit seated at the same two-person desk as Mr. Gamble during the cheating incident.

*Id.* at 16–17. As Mr. Gamble attested under oath, the alleged "cheat sheet" was equidistant from

---

[7]     This argument is not well-developed and appears to be included merely as an aside in the brief. However, it strains credulity to argue that using racial slurs against police recruits serves any sort of legitimate training purpose, but if the Defendants believe otherwise, they may make this argument to the jury.

each recruit, it appeared to be blank scrap paper, and Cpl. Piazza assumed only Mr. Gamble used it to cheat. *Id*. at 17–18 (citing Gamble Decl. ¶ 11–12).

I also find that Sheriff Berry has failed to show that the subsequent termination of the Caucasian female recruit for alleged academic dishonesty defeats Plaintiff's disparate treatment claim. This is because the other recruit, Nicole Marceron, herself has filed a lawsuit against the Defendants based upon alleged retaliatory conduct (in violation of Title VII) by Cpl. Piazza, and it was Cpl. Piazza who, as Mr. Gamble notes, was the driving force behind her termination. Am. Compl., *Marceron v. Charles Cnty. et al.*, No. 8:20-cv-3613-PJM (D. Md. Dec. 14, 2020) ECF No. 8. ¶¶ 26–30.[8] Ms. Marceron alleges the impetus for her termination was her participation as a witness in the internal affairs complaint Mr. Gamble and others made against Cpl. Piazza. *Id*. ¶¶ 26–30. The evidentiary effect in this case of Ms. Marceron's termination for alleged cheating depends on the legitimacy of the Defendants' contention that she actually cheated, and that cheating was the reason she was terminated from the academy. But having injected her circumstances into this lawsuit, the Defendants cannot avoid the obvious consequence that her own pending retaliation suit creates a genuine issues of material fact about whether she was dismissed as a cheater (which could be relevant to whether Mr. Gamble was treated disparately based on his race), or was herself the victim of similar discriminatory or retaliatory animus by Cpl. Piazza and the Sheriff.

Nor is Ms. Marceron's termination the lone issue when it comes to more favorable treatment of people outside Mr. Gamble's protected class. While Sheriff Berry attempts to argue that Cpl. Piazza did not single out African Americans, targeting also "Hispanics, Muslims, and

---

[8]     Under Fed. R. Evid. 201 and in light of the parties' citations to the *Marceron* case, Def. Berry's Mot. 9 n.1, Pl's Opp. 5, (ECF No. 33), I take judicial notice of the pending lawsuit in Case No. 8:20-cv-3613-PJM.

Christians (presumably white)," Def. Berry's Mot. 15, Defendants cite no authority that rampant discrimination, racism, or bigotry aimed at members of more than one protected class is a defense to a Title VII claim.   What Mr. Gamble must show on this element to overcome a summary judgment motion is that there are genuine disputes of material fact as to whether Defendants treated people outside of Mr. Gamble's class more favorably.   On that point, considering the Fourth Circuit's recognition of the highly charged nature of one of Cpl. Piazza's slurs of choice—the n-word—Mr. Gamble prevails because not all recruits were subjected to such an "unambiguously racial epithet."   *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 185 (4th Cir. 2001) (citation omitted).

Finally, in terms of similarly situated individuals, the undisputed facts reflect that Mr. Gamble shared the desk where the alleged "cheat sheet" was found during the CPR test with a Caucasian recruit, but that Cpl. Piazza suspected only Mr. Gamble of cheating, despite the fact that the paper was equidistant from both of the recruits.  Pl.'s Opp. at 17 (ECF No. 33).

Because I find it is undisputed that Mr. Gamble is a member of a protected class and suffered an adverse employment action, and because there are disputes of material fact as to whether he was performing adequately and whether Defendants treated similarly situated individuals outside the protected class more favorably, Mr. Gamble has made out a prima facie discrimination case that is not subject to dismissal or summary judgment.  *Coleman*, 626 F.3d at 190.

c)   Pretext

Having found that Plaintiff has made out a prima facie case, I must now assess whether there are disputes of material fact that the proffered legitimate non-discriminatory reason for terminating Mr. Gamble's employment was pretextual.   Where an employer produces evidence of a legitimate reason for adverse employment action, as Defendants have done here, a plaintiff must

then show by a preponderance of the evidence that the legitimate reason offered by the employer

is but a pretext for discrimination, thus creating an inference that the employer did act with

discriminatory intent. *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018). If the plaintiff

cannot produce more than just weak evidence demonstrating the falsity of the employer's proffered

reasons, then defendants are entitled to summary judgment as a matter of law. *See Reeves v.*

*Sanderson Plumbing*, 530 U.S. 133, 148 (2000) ("[A]n employer would be entitled to judgment as

a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the

employer's decision, or if the plaintiff created only a weak issue of fact as to whether the

employer's reason was untrue and there was abundant and uncontroverted independent evidence

that no discrimination had occurred."). I find that Mr. Gamble has, at this point, made the requisite

showing that there is sufficient evidence of pretext for his discrimination claim to survive.

First, it is particularly implausible that Mr. Gamble would need to cheat on a CPR

examination, given that he was a certified CPR instructor, Pl.'s Opp. 3 (ECF No. 33), and

considering his prior training and experience as a police officer and his familiarity with emergency

medicine dating to 1993. Gamble Interview 2–3, Ex. 2 to Berry Decl. (ECF No. 31-2 at 18–19).

While Sheriff Berry argues that whether Mr. Gamble was in fact cheating is the wrong inquiry and

that the Court must instead focus on whether the employer used its cheating policy pretextually,

Def. Berry's Mot. 20–21 (citing *Friedel v. City of Madison*, 832 F.2d 965, 973 (7th Cir. 1987)),[9]

---

[9]    This is a curious argument. If an employer has a policy that all cheaters will be fired, but
intentionally fabricates charges of cheating against an African-American employee in order to fire
him, it is hard to imagine how that would not be a pretextual use of a facially non-discriminatory
policy. As the Seventh Circuit itself made clear in the *Friedel* decision that Defendants cite, the
key question is whether "the . . . [p]olice [d]epartment . . . intended to discriminate against the
plaintiff[] on the basis of . . . race or gender . . . when the [d]epartment chose to dismiss [the
employee], not simply that it erred in applying or disseminating its cheating policy." *Friedel,* 832
F. 2d at 973. And this is precisely what Mr. Gamble claims in this case—that the Defendants

the fact that, shortly after Plaintiff filed an internal affairs complaint of racial discrimination against Cpl. Piazza, he levied a cheating allegation against Mr. Gamble on a test in a subject area where Mr. Gamble possessed expertise, with all inferences drawn in Mr. Gamble's favor, supports a finding that the allegation was fabricated and thus pretextual.

Further, while Defendants present evidence that other recruits who took the CPR exam corroborated the cheating allegation, that evidence is conclusory: the report does not name the recruits who purportedly backed up the cheating allegation, nor does Defendants' evidence definitively establish the cheating allegation against Mr. Gamble was disconnected from his engaging in the protected activity of reporting Cpl. Piazza's racist remarks. Ex. 2 to Def. Berry's Mot., Internal Investigation Report 4 (ECF No. 31-2 at 13). And while Defendants use Mr. Gamble's interview against him, the opposition brief stresses the numerous instances during that interview where Mr. Gamble *denied* cheating on his exam. Pl.'s Opp. 22 (ECF No. 33); *e.g.* Gamble Interview 4 ln. 110–13; 5 ln. 160–63; 6 ln. 204–21, Ex. 2 to Berry Decl. (ECF No. 31-2 at 19–21). Once again, at best the Defendants have succeeded in demonstrating that there is indeed a genuine dispute of material fact regarding whether the Plaintiff was cheating, and whether his termination on that basis was pretextual, and that is what the jury must decide. Therefore, the discrimination claim survives.

*Retaliation*

To establish a prima facie case of retaliation, a plaintiff must show that (1) he "engaged in a protected activity"; (2) his employer "acted adversely" against him; and (3) "the protected activity was causally connected to the adverse action." *Holland v. Washington Homes, Inc.*, 487

---

intentionally fabricated a cheating allegation in order to fire him on the basis of his race. Compl. ¶ 66–67.

F.3d 208, 218 (4th Cir. 2007); *see also Strothers*, 895 F.3d at 327 (clarifying that the third element is an "adverse action" rather than an "adverse employment action."). The standard for establishing an adverse action "is more lenient for retaliation claims than for substantive discrimination claims" because the adverse action in a retaliation case does not need to affect an employee's "terms and conditions of employment." *Kelly v. Berryhill*, Civil Action No. RDB-18-0049, 2019 WL 1300816, at *5 (D. Md. Mar. 20, 2019) (quoting *Burlington*, 548 U.S. at 64). Rather, the "plaintiff need only show that the challenged action 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington*, 543 U.S. at 68).

Mr. Gamble has submitted ample evidence to state a prima facie retaliation claim to survive dismissal or summary judgment. It is clear that he engaged in protected activity when he filed an internal affairs complaint of racial discrimination against Cpl. Piazza and there is no dispute that his employer took adverse action against him. As to the causal element, protected activity's temporal proximity to the adverse action is enough to give rise to an inference that the two are causally connected. *See Strothers*, 895 F.3d at 336–37. Here, the protected activity occurred on June 24th, Compl. ¶¶ 37, 38, and his employment was terminated on July 2nd, mere days later Compl. ¶ 4. That's enough.

The remaining issue on retaliation mirrors that of the discrimination claim: whether Sheriff Berry's reason for termination was pretextual. But for the reasons stated above, I find that there is sufficient evidence to create a triable issue as to whether the Defendants' proffered legitimate reason for termination was pretextual, and therefore Mr. Gamble's retaliation claim also survives.

*Charles County's Motion to Dismiss for Failure to Name*

While the County adopted Sheriff Berry's motion in full, it also added an additional basis that it claims warrants dismissal: Mr. Gamble, in filing his EEOC complaint, failed to comply with

Title VII's naming requirement because he named "Charles County Sheriff's Office" in his charge of discrimination, but no other party.  Def. Charles Cnty.'s Mot. 4; Ex. 1 to Def's Mot. (ECF No. 32-2).

As the County states in its motion, the Fourth Circuit requires that for a party to be sued under Title VII, it must have been named in the EEOC complaint.  This serves to put the party on notice and—critically—gives the alleged offending party an opportunity to voluntarily comply with the law.  Def. Charles Cnty.'s Mot. 5; *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 458–59 (4th Cir. 1988).  Considering EEOC complaints are often filed without the assistance of counsel, the Fourth Circuit's requirement is not rigid: where a complaint lists a party's name sufficiently close to the proper respondent, the name requirement gives way to the "substantial identity exception."  *Id.* at 461.

To determine whether the substantial identity exception applies, courts assess the following factors:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
> 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;
> 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;
> 4) whether the unnamed party had in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*McAdoo v. Toll*, 591 F. Supp. 1399, 1403 (D. Md. 1984).  As Mr. Gamble notes, the second and third factors are the "most important."  Pl.'s Opp. 5 (ECF No. 34) (citing *Crosten v. Kamauf,* 932 F. Supp. 676, 682 (D. Md. 1996)).  The parties agree on the applicable law; the dispute here concerns application of the above factors.  Mr. Gamble also cites the *Penhollow* case, where the Maryland Court of Special Appeals held that naming a county sheriff's office in lieu of the county

in an EEOC charge is not fatal to a Title VII action.  *Penhollow v. Bd. of Comm'rs for Cecil Cnty.*, 695 A.2d 1268, 1279 (Md. Ct. Spec. App. 1997).

As to the first factor, the County argues that Mr. Gamble's law enforcement experience means he should have known to name both Sheriff Berry and the County.  Def. Charles Cnty.'s Mot. 7.  The County also looks to Mr. Gamble's second amended complaint (wherein Mr. Gamble alleges his employment application identified the Charles County Government) as evidence Mr. Gamble should have known the County was his employer.  The complaint also alleges Mr. Gamble received paychecks and his W-2 from the County, which the County argues ought to have put him on notice that the County was his employer. Def. Charles Cnty.'s Mot. 7 (Citing Compl. ¶¶ 17, 18).  Mr. Gamble relies on this same evidence to argue he believed naming the Charles County Sheriff's Office was necessarily naming the County.  Pl.'s Opp. 6 (ECF No. 34).

On the second factor, the County differentiates itself from the Office of the Sheriff, noting that the Sheriff is an independently elected officer with a law office separate from the County's.  Def. Charles Cnty.'s Mot. 8.  The Sheriff has total control over the Sheriff's office, not the County.  *Id.* (citing Md. Code. Ann., Cts & Jud Proc. § 2-309(j)(5)(iv)).

As to the third factor—prejudice—the County argues that going unnamed in the EEOC complaint meant the County neither participated in the EEOC process, nor presented its claims.  Def. Charles Cnty.'s Mot. 9 (citing *Crosten*, 932 F. Supp. at 682).  In *Crosten*, the Court found that the prejudice to an unnamed employer was considerable due to the employer lacking any "indication that Plaintiff sought to hold him *personally* liable for the alleged conduct."  *Crosten*, 932 F. Supp. at 682 (emphasis added).  The County also argues that it at no point held out to Mr. Gamble that its relationship to him ran through the Sheriff's office.  *Id.*

The record before me is sufficient to conclude that dismissal is not warranted and that the substantial identity exception applies. While Mr. Gamble—who is a layman—may have been able to determine whether the Sheriff and County are distinct entities, this is far from common knowledge, and doing so requires careful analysis of multiple sections of the Maryland Code. It is true that the Code grants the Sheriff distinct powers that separate it from the County, such as the ability to determine the office's mission, budget, and organizational structure, Md. Code. Ann., Cts & Jud Proc. § 2-309(j)(5)(iv). But in other ways the Sheriff's Office and County are intertwined, such as the Sheriff being bound by rules and regulations developed in part by the Board of County Commissioners when appointing the necessary number of deputy sheriffs, *id*., § 2-309(j)(3). Thus, while the County argues the distinction is clear-cut, a review of the governing statute suggests that this is much less clear, and therefore the first factor does not strongly favor the County.

As to whether the County's and Sheriff's interests are so similar that naming the County was unnecessary, like the court in *Penhollow*, I find that the County's funding of the Sheriff's Office amounts to the two entities having similar interests. While the Sheriff possesses significant control over the office, Mr. Gamble correctly argues that the County funds the office, Pl.'s Opp. 6 (ECF No. 34), and the fact that the County and Sheriff's Office have separate law offices is not a strong enough reason to differentiate the entities to the extent that an employee who seeks to file an EEOC claim should be responsible for naming each entity separately. And while the County argues the Sheriff could not properly or effectively represent the County's interests before the EEOC, Def. Charles Cnty.'s Mot. 9, the County fails to articulate how those interests significantly differ from the Sheriff's, particularly considering that the County funds the Sherriff, and the

County has not shown that the facts of the dispute would have changed in any meaningful way had the County been individually named in the EEOC complaint.

As to prejudice, the EEOC filing did not result in an adverse finding against either the County or the Sheriff; it is wholly implausible that, had the County been named in the EEOC filing, it would have altered its course as to Mr. Gamble in the EEOC proceedings because the commission found that Mr. Gamble had not made out a statutory violation.

And finally, there is no suggestion that the County held out to Mr. Gamble that the County and Sheriff were one and the same; therefore, this factor weighs somewhat against Mr. Gamble. But, on balance, the factors do not warrant dismissal of the County.

## Conclusion

For the foregoing reasons, the Defendants' joint motions for summary judgement are denied, and Defendant Charles County's separate motion to dismiss is also denied.   A scheduling order will be issued, and the Court will hold a Fed. R. Civ. P. 16 case scheduling conference.   A separate order will be issued implementing this Memorandum.

DATED this 9th day of August, 2021.

BY THE COURT:

_____/s/_____

Paul W. Grimm
United States District Judge